Donald A. PETERSON and Louise J. Peterson, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. F-5-62.

United States District Court D. Alaska.

April 16, 1963.

Eugene R. Belland, Miller & Belland, Fairbanks, Alaska, for plaintiffs.

Douglas M. Fryer, Admiralty & Shipping Section, U. S. Dept. of Justice, Seattle, Wash., Joseph H. Shortell, Jr., Asst. U. S. Atty., Fairbanks, Alaska, for defendant.

PLUMMER, District Judge.

This action was brought by plaintiffs under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b) and 2671–2680, to recover money damages for injury and loss of property allegedly caused by the negligent dynamiting of an ice jam which had formed in the Chena River within the boundaries of Ladd Air Force Base, near Fairbanks, Alaska, on May 2, 1960, by representatives of the Corps of Engineers.

Plaintiffs were the owners of the following registered vessels, with appurtenances, miscellaneous facilities, equipment, tools, fuel and supplies used in conjunction therewith:

| Name of Vessel | Bureau of Customs Official No. | Type of Vessel |
|---|---|---|
| ELAINE G. | 258597 | Oil Stern Wheel |
| BONNIE G. | 265321 | Oil Stern Wheel |
| COLLEEN | 275992 | Scow |
| MARTHA | 275993 | Scow |
| BARGE No. 2 | 249013 | Scow |

The Chena River, also known as the Chena Slough, downstream, and for some distance upstream, from University Avenue, near Fairbanks, Alaska is a navigable water of the United States of America.

On and immediately prior to May 2, 1960, plaintiffs' vessels, with the exception of the BONNIE G, were moored and floating in the waters of the Chena River near a site on the south shore of said river known as Peterson's Landing. The BONNIE G had been taken out of the river in the fall of 1958 and was resting on logs on the north shore of the river a short distance upstream from Peterson's Landing.

The break-up of the Chena River in the spring of 1960 was unusual, in that the snow from the hills located in the

headwaters of the river melted rapidly in about three days and the pressure of the water released by the melted snow caused the ice in the river to rise and move.

William L. Aley, Deputy Base Civil Engineer at Ladd Air Force Base on May 2, 1960, had been employed in various capacities at Ladd Field for 18½ years and had observed the spring run-offs of the Chena River on many occasions. He had observed the river each day on his way to work in the spring of 1960 and did so on May 2nd at approximately 7:00 a. m. At that time he observed that the river was significantly higher than on the previous day and that ice was flowing in the river. Because of past experiences during previous spring run-offs, he was concerned and after arriving at work he discussed his observations with his superior, Lt. Col. Christopher McCooe, Base Civil Engineer, who had the responsibility of flood control and any other disaster or emergency activities. Col. McCooe instructed Mr. Aley to continue his observations of the river and to take whatever action he considered necessary.

Mr. Aley next discussed the situation with Maj. Rankin, Resident Engineer, Ladd Air Force Base, and with Harold Gillam, Jr., City Engineer for the City of Fairbanks. Between 9:00 and 10:00 a. m. Maj. Rankin, Mr. Gillam and Mr. Aley made a trip by helicopter upstream approximately 40 river miles or approximately 20 to 25 aerial miles to observe run-off conditions in the river and surrounding area. Following this, Mr. Aley kept the river under observation throughout the day.

At approximately 2:00 p. m. a large sheet of ice moved into a bend of the river located within the boundaries of Ladd Air Force Base and lodged there. The flow of ice and water was thereby restricted and an ice jam commenced to form. Mr. Aley thereafter discussed the matter with Col. McCooe, Col. Browning, Maj. Rankin and Mr. Gillam. The possibility of blasting was discussed at that time but no decision was made. Col.

Browning attended the conference since he was Director of Material at Ladd Air Force Base and had charge of blasting material. In the late afternoon it appeared that the ice jam might break without blasting as the water had cut around the northeast side and a heavy flow of water and some ice was moving. However, the moving ice ran into some trees and caused an even tighter jam.

A second observation trip was made by helicopter in the late afternoon. It was observed then that the ice jam was building up rapidly and that it would be necessary to blast. Around 5:00 p. m. another conference was had and it was decided by those in attendance, including Mr. Gillam, that the jam would have to be blasted. The Corps of Engineers made arrangements to have the blasting done by an Air Force Ordinance Group who were experts in this type of work.

The actual blasting commenced around 7:00 p. m. and was accomplished by starting at the face of the jam and working toward the base of the jam, blasting a channel as they went along.

In the vicinity of Badger Road, at the eastern boundary of Ladd Air Force Base, in the area located near Mile 6 on the Richardson Highway, the waters had risen approximately twelve to fifteen feet above the normal water level of the river. The river had overflowed its banks and water was traveling east up to Two Mile Slough drain and then going down Badger Road south at a depth of approximately two feet.

During the period of blasting the jam continued to build up. Huge masses of ice of all sizes accumulated. It was estimated that the face of the jam was twenty feet high and its length one-half mile up-river. The water had overflowed the river banks and had flooded the lower end of instrument runways at Ladd Air Force Base and other facilities and installations at the Base were being endangered.

The blasting continued until sometime after 11:00 p. m. on May 2, 1960. Approximately fifteen minutes after the last

charges were detonated the flood waters and ice, which had been impounded by the ice jam, started moving downstream.

The Peterson Landing area where plaintiffs' vessels were located was approximately five river miles downstream from the City of Fairbanks. On May 2, 1960, there was a normal run of ice in the Chena River in that area. Around 7:00 p. m. the run of ice slowed up and at or about 8:00 p. m. the run of ice in the river stopped. Later the ice began to run again and the water in the river began to rise. The run of ice and water which preceded the damage to plaintiffs' vessels started slowly and then increased. Between 5:00 and 6:00 a. m. on May 3, 1960, the ice and water ran bank to bank all at once and was then over.

The water and ice caused the logs on which the BONNIE G was resting on the north shore of the river to be knocked ajar and a second 'set of logs, located on the north shore, which had been used as a ways, were pulled loose and washed downstream. BARGE No. 2 broke loose from its mooring and was carried downstream. The ELAINE G was partially pushed up on the south shore and was partially sunk. The MARTHA and COLLEEN were pushed up on the south shore and almost sank when the waters receded.

As a fifth affirmative defense defendant alleged as follows:

"That the defendant is immune from suit for any damage caused by the release of ice in the Chena River since defendant's actions were done solely to prevent a threatened injury from a force of nature to the Ladd Air Force Base property and to the community of Fairbanks, Alaska, and said acts were thus privileged."

During the course of trial on January 14, 1963, defendant filed a Second Supplemental Memorandum in which it asserted as a defense Section 702c of Title 33, United States Code, the pertinent portion of which provides as follows:

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place:
* * * *"

The evidence establishes that the waters of the Chena River were out of their natural channel and had overflowed the banks of the river prior to the time that the ice jam was dislodged by dynamiting. The evidence also establishes that the flood waters thereby released or diverted were material factors in the damage sustained by plaintiffs' vessels.

The responsibility for flood control is conferred by Congress on the Department of the Army under the direction of the Secretary of the Army (formerly the Secretary of War) and supervision of the Chief of Engineers.

The Act of July 1, 1935, c. 352, 49 Stat. 441, provides:

"That the Secretary of War is authorized and directed to cause a preliminary examination to be made of the Tanana River and Chena Slough in the vicinity of Fairbanks, Alaska, with a view to the control of floods in said Chena Slough, in accordance with the provisions of section 3 of an Act entitled 'An Act to provide for control of floods of the Mississippi River, and of the Sacramento River, California, and for other purposes', approved March 1, 1917, the cost thereof to be paid from appropriations heretofore or hereafter made for examinations, surveys, and contingencies of rivers and harbors."

See also the Act of August 30, 1935, c. 831, § 3, 49 Stat. at pages 1040 and 1048, and the Act of June 22, 1936, c. 688, § 6, 49 Stat. at pages 1592 and 1596.

The Act of June 28, 1938, c. 795, § 4, 52 Stat. at pages 1216 and 1223, provides in part as follows:

"Sec. 4. That the following works of improvement for the benefit of navigation and the control of destructive floodwaters and other purposes are hereby adopted and authorized to be prosecuted under the direction of the Secretary of War

and supervision of the Chief of Engineers in accordance with the plans in the respective reports hereinafter designated: * * *.

* * * * * *

"TANANA RIVER AND CHENA SLOUGH, ALASKA

"The plan for the protection of the city of Fairbanks, Alaska, and vicinity by means of an earth and rock levee and for the relocation of a portion of the Richardson Highway as set forth in House Document Numbered § 61, Seventy-fifth Congress, third session, is approved and for the execution of this plan there is hereby authorized $565,000."

Executive Order 8020, December 2, 1938, 3 C.F.R., Cum.Supp. (1943), provides as follows:

"WITHDRAWAL OF PUBLIC LAND IN AID OF FLOOD CONTROL

"ALASKA

"By virtue of and pursuant to the authority vested in me by the act of June 25, 1910, c. 421, 36 Stat. 847, as amended by the act of August 24, 1912, c. 369, 37 Stat. 497, and subject to the conditions therein expressed, it is ordered that all public lands in the following-described areas in Alaska be, and they are hereby, temporarily withdrawn from settlement, location, sale, or entry, for flood-control purposes in connection with the Tanana River and Chena Slough flood-control project under the supervision of the War Department as authorized by the act of June 28, 1938, 52 Stat. 1215:

"Fairbanks Meridian

"T. 2 S., R. 2 E., secs. 22 to 27, inclusive, 35 and 36,

"T. 3 S., R. 2 E., those parts of secs. 1, 2 and 12 east of Tanana River,

"T. 2 S., R. 3 E., secs. 19 and 28 to 34, inclusive (unsurveyed),

"T. 3 S., R. 3 E., all east of Tanana River (partly unsurveyed),

"T. 4 S., R. 3 E., secs. 1, 12 and 13,

"T. 3 S., R. 4 E., secs. 6, 7, 18, 19, 30 and 31 (unsurveyed),

"T. 4 S., R. 4 E., secs. 6, 7, 18 and 19, containing approximately 24,503.53 acres.

"This order shall continue in force until revoked by the President or by an act of Congress.

"Franklin D Roosevelt"

Mr. Aley testified that this levee had been constructed prior to World War II.

The Act of July 24, 1946, c. 596, § 11, 60 Stat. at pages 651 and 652, authorized and directed the Secretary of War to cause preliminary examinations and surveys for flood control, etc., on the Chena Slough, Alaska, the cost thereof to be paid from appropriations heretofore or hereafter made for such purposes.

Public Law 85–500, the Act of July 3, 1958, 72 Stat. 297 at pages 305 and 315, provides that the project for flood protection on the Chena River at Fairbanks, Alaska, was thereby authorized substantially in accordance with the recommendation of the Chief of Engineers and House Document Numbered 137, 84th Congress, at an estimated cost of $9,-727,000. There is no evidence in the record that this project was ever accomplished.

In Clark v. United States, 218 F.2d 446, 451 (9th Cir. 1954), the court stated as follows:

"As to the liability of the United States because of the alleged negligence of the Engineers, we think a provision of 33 U.S.C.A. § 702c bars recovery. That section places certain conditions upon federal expenditures in aid of flood control and provides that: 'No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place'. Appellants assert that this provision applies only to flood control aid on the Mississippi; however, supplemental acts authorizing expenditures on other rivers incorporate this provision. 33 U.S.C.A.

§ 701e. We find no merit in appellants' contention that the Tort Claims Act repealed this provision by implication. The provision of 33 U.S.C.A. § 702c barring liability 'from or by floods or flood waters' expresses a policy that any federal aid to the local authorities in charge of flood control shall be conditioned upon federal non-liability. To base recovery here on any act or omission of the Engineers in assisting in the fight against this flood would run counter to the policy thus expressed. See National Mfg. Co. v. United States, 8 Cir., 1954, 210 F.2d 263, 270–275, certiorari denied, 347 U.S. 967, 74 S.Ct. 778 [98 L.Ed. 1108]."

In National Mfg. Co. v. United States, 210 F.2d 263, 271 (8th Cir. 1954), the court in its opinion stated in part as follows:

" * * * The section [33 USCA § 702c] does not limit the bar against such recovery to cases where floods or flood waters are the sole cause of damages. It does bar liability of any kind from damages 'by' floods or flood waters but it goes further and in addition it bars liability for damages that result (even indirectly) 'from' floods. The use of the word 'from' in addition to 'by' makes it clear that the bar against federal liability for damages is made to apply wherever floods or flood waters have been substantial and material factors in destroying or damaging property. The language used shows Congressional anticipation that it will be claimed after the happening of floods that negligence of government employees was a proximate cause of damages where floods or flood waters have destroyed or damaged goods. But the section prohibits government liability of 'any kind' and at 'any place'. So that uniformly and throughout the country at any place where there is damage 'from' or 'by' a flood or flood waters in spite of and notwithstanding federal flood control works no

liability of any kind may attach to or rest upon the United States therefor."

In Stover v. United States, 204 F.Supp. 477, 482, 484 (N.D.Cal.1962), the court in its opinion stated in part as follows:

" * * * On the issue presently before me, [the limited issue raised by the affirmative defense of the United States involving the provisions of Title 33 USCA § 702c] it is of no consequence how negligent the Government may (or may not) have been, if it be shown that the inundations, even in part, resulted from, and were actually caused by, such natural forces.

" * * * Section 702c applies only to situations where natural forces alone, or in conjunction with artificial causes, such as negligence, operate to bring about the final result.

" * * * It appears that § 702c was, and is, intended to save the United States harmless from liability in cases involving natural floods, or flood waters, whether or not there is a concurrence of negligence with such flood waters. * * * "

By reason of the foregoing, I make the following Findings of Fact:

1. Prior to May 2, 1960, federal funds had been expended for studies, preliminary examinations, surveys, reports and the construction of a levee in aid of the control of destructive flood waters on the Chena River.

2. During the spring of 1960 unusual and extraordinary climatic conditions existed in the headwaters and drainage areas of the Chena River causing the snow to melt and run off into said river in a period of about three days.

3. The water from this run-off came so fast that it caused the ice in the Chena River to rise or lift and to move. As a result thereof an ice jam, caused solely by natural forces, formed in the Chena River, within the boundaries of Ladd Air Force Base on May 2, 1960.

4. By reason of said ice jam, water and ice became impounded, causing the waters of the Chena River to overflow their natural banks and channels and to flood certain areas near Badger Road and on Ladd Air Force Base.

5. To alleviate and control the flood waters and in an attempt to prevent further damage in the Badger Road area, at Ladd Air Force Base and in the Fairbanks area, the Corps of Engineers caused the ice jam to be dynamited.

6. As a result of this action on the part of the Corps of Engineers, the water and ice impounded by the ice jam was released and proceeded down-river, and plaintiffs' vessels were thereby damaged.

From the foregoing Findings of Fact, I make the following Conclusions of Law:

1. This Court has jurisdiction under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b) and 2671–2680.

2. Title 33 U.S.C.A. § 702c applies to all floods and flood waters which result in whole or in part from unusual or extraordinary climatic conditions.

3. The water and ice which damaged the plaintiff's vessels on May 3, 1960, were a part of a flood, within the meaning of the terms "floods or flood waters" as used in Title 33 U.S.C.A. § 702c. Section 702c of Title 33 U.S.C.A. therefore provides the defendant, United States of America, with a complete legal defense to this action.

It is, therefore, ORDERED that plaintiffs take nothing by this action and that, pursuant to paragraph IV(7), page 7, of the Pre-Trial Order herein, defendant United States of America have judgment against plaintiffs for the sum of Eleven Thousand Two Hundred Forty-five Dollars and Eighty-five Cents ($11,-245.85) with interest accruing from June 3, 1960, for unpaid taxes.

Counsel for defendant is directed to prepare, serve and submit Findings of Fact and Conclusions of Law and Judgment in accordance with the provisions of Rule 12 of the United States District Court for the District of Alaska.