MORICI CORPORATION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. S–77–218.

United States District Court,
E. D. California.

June 6, 1980.

Martin McDonough, Bruce McDonough, McDonough, Holland & Allen, Sacramento, Cal., for plaintiff.

Herman Sillas, U. S. Atty., Francis M. Goldsberry, II, Asst. U. S. Atty., Mary Beth Uitti, Asst. U. S. Atty., Sacramento, Cal., for defendant.

MacBRIDE, District Judge.

## OPINION

This action for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, is before the court on the defendant-United States' motion to dismiss. The complaint was filed on April 20, 1977, and the United States brought on the instant motion to dismiss in due course. In the interim since oral arguments were heard, this court has twice directed the parties to submit additional briefing on relevant issues.[1] That briefing having been filed, the matter is now before the court for decision.

*Factual Background.* Plaintiff filed an administrative claim for damages under the Federal Tort Claims Act on January 30, 1976 with the Bureau of Reclamation, Department of the Interior, and the Corps of Engineers, Department of Defense. The claim states that, from approximately March 25 to April 5, 1974, the plaintiff incurred damages of $1,000,000 as a result of the destruction of approximately 2,700 fruit and nut trees and 150 acres of wheat and barley. An attachment to that claim explains:

> The Bureau of Reclamation by its operation of the reservoirs of the Central Valley Project, including, but not limited to, Shasta Reservoir, wrongfully and negligently or wilfully caused, or allowed, the water levels in the Sacramento River traversing Princeton Ranch to be so high during the period of approximately March 25 to April 10, 1974, that such water seeped from the river into the cultivated lands of Princeton Ranch, and the resulting high water table in such cultivated lands destroyed a large part of the fruit and nut trees and other crops thereon.

> The Corps of Engineers wrongfully and negligently or wilfully, advised or direct-

---

1. Both the original briefing and the two sets of supplemental briefs submitted by the parties are notable for their excellence. Counsel for both plaintiff and defendant have greatly assisted the court in their lucid exposition of the issues and the relevant law.

ed the Bureau of Reclamation to operate such reservoirs in such a manner as to cause the damage of claimant, as aforesaid.

Complaint, Exhibit B.

The administrative claim was denied on March 4, 1976 by Charles R. Renda, Regional Solicitor, Department of the Interior. Plaintiff's request for reconsideration was denied on October 20, 1976, and this action was instituted six months later on April 20, 1977. The complaint invokes the court's jurisdiction under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674. The complaint states that the defendant-United States owns and operates the Shasta Dam and Reservoir, the Keswick Dam and Reservoir, and the Trinity River Diversion, which are part of the Sacramento River system, located upstream from plaintiff's property, the Princeton Ranch. These dams and reservoirs are operated "as part of the federal Central Valley reclamation project," Complaint at 1, and are referred to in the complaint as the Project Works. Next, the complaint alleges:

The Project Works are capable of regulating the level of water in the Sacramento River below those works so as to greatly diminish or augment the natural flow of said River, at the direction of the operator. Defendant, its employees and agents, as operators of the Project Works, owed a duty of care to plaintiff to avoid unnecessary and harmful changes in the level of said River due to their operation of the Project Works.

Complaint at 2. With this foundation, the complaint alleges:

Beginning on or about December 1, 1973, and continuing through April, 1974, defendant, its agents and employees operated the Project Works negligently, without due or reasonable care, so as to establish and maintain the flow in the Sacramento River above and adjacent to Princeton Ranch at such high elevations as to cause water in large amounts to seep from the Sacramento River into Princeton Ranch. The seepage was the natural and predictable result of the high elevations.

*Id.* The injuries to the plaintiff are said to have occurred as a proximate result of the alleged negligent acts in operating the Project Works. The prayer for damages in the complaint is identical to that in the administrative claim.

The United States responded to the complaint by filing a motion to dismiss for failure to state a claim on which relief can be granted. The motion is based on the provisions of 33 U.S.C. § 702c which immunize the United States from liability for damages under certain circumstances. Section 702c provides in pertinent part:

No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place. . . .

Before the motion came on for hearing, this court issued its decision in a related case, *Sanborn v. United States*, 453 F.Supp. 651 (E.D.Cal.1977), and the parties continued the hearing in order that further briefing might be prepared in light of that decision. That briefing was filed, and oral arguments were heard on December 12, 1977. On that date, the Court directed the parties to file additional briefing on the question whether seepage can constitute "floods or flood waters" within the meaning of section 702c. Thereafter the court requested briefing on the implications of *Accardi v. United States*, 599 F.2d 423 (Ct.Cl.1979). The matter now being fully briefed, the time has come for a decision.

The United States contends in its motion to dismiss that, even giving the complaint the most favorable reading, there is no set of facts under which plaintiff could be entitled to recover for the injury alleged. This result obtains, in the United States' view, because plaintiff alleges that its injury arose from the operation of the Central Valley Project, a multi-purpose project devoted in part to flood control, and because section 702c immunizes the United States from damage actions arising from the operation of such a project. The plaintiff opposes the motion to dismiss for a number of reasons. First, plaintiff urges that section

702c is not applicable when the damages arise from seepage rather than "floods or flood waters." Second, plaintiff argues that section 702c is not applicable to a reclamation project such as the Central Valley Project. Finally, plaintiff contends that, even if section 702c were applicable to the Central Valley Project, the section does not immunize operations or project facilities directed to other purposes than flood control, such as irrigation, production of electricity, and preservation of wildlife.

As an initial matter, the court will discuss the purpose and scope of the immunity provided in section 702c in order to lay the foundation for consideration of the specific points raised by the parties. Thereafter, the court will address the motion to dismiss and the points raised in opposition to the motion.

### I. *The Purpose and Scope of Section 702c*

The immunity provisions of section 702c were first adopted as section 3 of the Flood Control Act of 1928, an act primarily directed to the development of flood control works on the Mississippi River. Act of May 15, 1928, ch. 569, § 3, 45 Stat. 535, *codified at* 33 U.S.C. § 702c. The legislative history of the section is, as described by *Graci v. United States*, 456 F.2d 20, 23 (5th Cir. 1971), "singularly unrevealing" because the immunity provision was not introduced into the Bill, S. 3740, until shortly before the final version was enacted. As explained by the district court in *Graci,*

> The immunity proviso was not contained in any form in the Bill as it was first introduced or while it made its first trip through both houses of Congress. The provision was part of an amendment offered in connection with a Federal-State issue late in the proceedings. The only comment concerning the provision which our search has disclosed was made by a member on the floor of the House to the

effect that in engaging itself in flood control works, the government should not lay itself open to suits for flood damage. See 69 Cong.Rec. 7022.

*Graci v. United States,* 301 F.Supp. 947, 953 n.8 (E.D.La.1969), *aff'd,* 456 F.2d 20 (5th Cir. 1971). The Fifth Circuit commented on this point that "[o]ur independent review of the legislative history, with the aid of the parties, has uncovered nothing more illuminating." *Id.,* 456 F.2d at 23.

■ Although section 3 of the 1928 Act may have been limited initially in application to the Mississippi River flood control activities, the immunity provided in section 702c was freed from geographical limitations by the Flood Control Act of 1936. Act of June 22, 1936, ch. 688, §§ 1, 8, 49 Stat. 1570, 1596, *codified at* 33 U.S.C. §§ 701a, 701e.[2] As the leading case has described it, by enacting the 1936 Act,

> Congress "adopted and authorized to be prosecuted" as "works of improvement, for the benefit of navigation and the control of destructive flood waters and other purposes" hundreds of flood control projects in all parts of the country including "levees and flood walls to protect people and city property" . . . . Congress also affirmed the application to the 1936 Act of the general provisions of the 1928 Act including Section [702c] by providing . . .
>
> "Nothing in this Act shall be construed as repealing or amending any provisions of the Act entitled 'An Act for the control of floods on the Mississippi River and its tributaries, and for other purposes', approved May 15, 1928, or any provision of law amendatory thereof." 33 U.S.C.A. § 701e.

*National Manufacturing Co. v. United States,* 210 F.2d 263, 270 (8th Cir.), *cert. denied,* 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954).

---

**2.** An often repeated and defeated argument raised in opposition to the application of the immunity afforded by section 702c is that its protection is limited to the Mississippi River projects. As noted by *Lenoir v. Porters Creek Watershed District,* 586 F.2d 1081, 1086 (6th

Cir. 1978), "[t]his view has not commended itself to those courts which have considered it." *E.g., id.* at 1086 n.4 (collecting the cases); *Hayes v. United States,* 585 F.2d 701, 702 (4th Cir. 1978); *Clark v. United States,* 218 F.2d 446, 452 (9th Cir. 1954).

The starting place for any discussion of the purpose and scope of section 702c is the Eighth Circuit's decision in *National Manufacturing* which offers a complete exposition of the prevailing interpretation of the section. The *National Manufacturing* action arose after the inundation of plaintiffs' premises when the Kansas River overflowed its banks and levees. Plaintiffs sought to ground liability under the Federal Tort Claims Act not on the flood itself but on alleged negligence by federal agencies which had assured plaintiffs prior to the flood that the River would not overflow and which failed to provide notice of the impending overflow in time for plaintiffs to transport movable property from the flood area. The issue was joined when the United States urged that recovery was barred by section 702c. The court stated:

> when Congress entered upon flood control on the great scale contemplated by the [1928 and 1936] Acts it safeguarded the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language. The cost of flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them. . . . [T]here is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding the great government works undertaken to minimize them. Congress included Section 3 in the 1928 Act and carried it forward into the 1936 Act and others with intent to exercise that power completely and to absolutely bar any such federal liability.

*Id.* at 270. The court noted that, when the immunity provision was enacted and then applied to nationwide flood control activities, the United States enjoyed full sovereign immunity from liability for torts; the

Federal Tort Claims Act was not passed until 1946. Nonetheless,

> when Section 3 is read in its context it is clear Congress meant by it that damages from or by floods or flood waters should not afford any basis of liability against the United States regardless of whether the sovereign immunity was availed or not. The declaration of Section 3 negates the existence of a cause of action against the United States in the situation covered by it.

*Id.* at 271.[3]

The plaintiffs in *National Manufacturing* contended that their damages were occasioned by the oil, mud and debris carried with the waters which inundated their property and that the negligence of the United States employees and agents was the proximate cause of their injury. The court responded:

> it is in just such a situation that the language of Section 3 plainly bars recovery against the United States. The section does not limit the bar against such recovery to cases where floods or flood waters are the sole cause of damages. It does bar liability of any kind from damages "by" floods or flood waters but it goes further and in addition it bars liability for damages that result (even indirectly) "from" floods. The use of the word "from" in addition to "by" makes it clear that the bar against federal liability for damages is made to apply wherever floods or flood waters have been substantial and material factors in destroying or damaging property. . . . [U]niformly and throughout the country at any place where there is damage "from" or "by" a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor.

*Id.* The court returned to this theme later in the decision, stating that

---

**3.** The contention that the Federal Tort Claims Act impliedly repealed the immunity granted by section 702c has been rejected by every court to consider the point. *E. g., Taylor v. United States*, 590 F.2d 263, 266 & n.4 (8th Cir. 1979); *Callaway v. United States*, 568 F.2d 684, 686 (10th Cir. 1978); *Florida East Coast Ry. v. United States*, 519 F.2d 1184, 1191–92 & n.8 (5th Cir. 1975).

the great contribution of the United States to the struggle that has continued for generations and will long continue, to conquer floods, has been made on the basis of federal nonliability for flood damages. That has been the condition of the government's contribution. There is no cause of action for recovery of damages from or by floods or flood waters. *Id.* at 275. Under this reasoning, the *National Manufacturing* court affirmed the judgments dismissing the actions for damages.

The interpretation underlying the decision in *National Manufacturing* that the immunity provision may have been included in the statute as a quid pro quo to the enactment of flood control legislation is a recurring interpretation. In *Stover v. United States*, 332 F.2d 204, 207 (9th Cir.), *cert. denied*, 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964), for example, the court held that there could be no recovery for damages caused by flooding after a levee broke, stating:

> It may be that morally and financially the plaintiffs have been grievously wronged by their government; that in protecting others it injured them. It is not committed to us to remake the statute. That the limitation [of liability in section 702c] should happen to be in the statute is understandable. Appropriations for flood control do not come automatically. Dozens of congressmen have no flood control problems. Perhaps, as a condition to their consent to flood control appropriations, they impose such limitations as § 702c.
>
> Congress can change § 702c and the Federal Tort Claims Act if it wants to do so. We cannot.

*Accord, Clark v. United States*, 218 F.2d 446, 452 (9th Cir. 1954) (section 702c "expresses a policy that any federal aid to the local authorities in charge of flood control shall be conditioned upon federal non-liability."). After reviewing these cases, the Fourth Circuit concluded in *Graci v. United States*, 456 F.2d 20, 25 (4th Cir. 1971), that the

cases, and what little legislative history there is, strongly support the view that the purpose of § 3 [section 702c] was to place a limit on the amount of money that Congress would spend in connection with flood control programs. Congress undoubtedly realized that the cost of extensive flood control projects would be great and determined that those costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts.

The broad interpretation of the immunity granted in section 702c set forth in *National Manufacturing* has been followed in the majority of the cases arising under the section. Such early Ninth Circuit decisions as *Clark* and *Stover* quoted *National Manufacturing* at length and followed its reasoning. Nevertheless, there have been instances in which the courts have declined to accord the United States immunity under the section based on the particular facts presented. As explained by the Ninth Circuit in *McClaskey v. United States*, 386 F.2d 807, 808 n.1 (9th Cir. 1967), although section 702c provides broad immunity, "[i]t does not follow that the mere happening of a flood insulates the Government from all damage claims flowing from it."

Turning to the instances in which the section 702c immunity has not been applied, the most significant line of cases began with the Ninth Circuit's decision in *Peterson v. United States*, 367 F.2d 271 (9th Cir. 1966). The *Peterson* case arose from the alleged negligence of engineers attached to the Ladd Air Force Base in Alaska. A natural ice jam had occurred at a bend in the Chena River at a point within the boundaries of the Base; the jam had been caused by unusually heavy spring run-off and it acted to impound water and ice which then overflowed and flooded portions of the Base. In order to alleviate that flooding, military engineers at the Base caused the ice jam to be dynamited. No notice was given to those downstream from the ice jam, and the sudden breakup of the jam discharged a large accumulation of water and ice chunks downriver, damaging

the plaintiffs' vessels which were moored in the river or beached on the shore. After trial, the district court ruled that section 702c applies to all floods and flood waters which result from unusual or extraordinary climatic conditions and that the ice and water which damaged plaintiffs' vessels were part of a "flood" within the meaning of the section. Accordingly, the district court dismissed the action as barred by section 702c. *Peterson v. United States,* 217 F.Supp. 867, 873 (D.Alaska 1963).

The Ninth Circuit reversed. The court noted that, although federal funds had been expended for studies and preliminary work on the construction of a levee on the Chena River, the plaintiffs did not seek recovery based on any such flood control activity. Instead, plaintiffs' theory of liability looked only to the alleged negligence in connection with the dynamiting of the ice jam. The Ninth Circuit stated:

> The decision to dynamite the ice jam was wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization. Rather, the decision to dynamite the ice jam was made . . . to alleviate and control the flood waters in an attempt to prevent further damage in the Badger Road Area at Ladd Air Force Base, and in the Fairbanks area.

*Peterson v. United States, supra,* 367 F.2d at 275. The court concluded that section 702c "must be viewed in proper context." In that context, the Ninth Circuit found it clear that Congress intended by the enactment of Section 702c in the Act of May 15, 1928, and in similar subsequent flood control Acts to be an integral part of a plan or policy of the Government to embark on a vast construction program to prevent or minimize the incidences of loss

occurring from floods and flood waters by the building of dikes, dams, levees and related works, and to keep the Government entirely free from liability for damages when loss occurs, notwithstanding the works undertaken to minimize it. *Id.* at 275–76. Given the historical circumstances in which the section was enacted, the court ruled that the immunity should not apply to all floods which result from unusual or extraordinary climatic conditions and that the district court had erred in its decision that the water and ice which caused the damage constituted part of a flood or flood waters within the meaning of section 702c. The court found the three cases relied on by the district court, namely, *National Manufacturing, Stover* and *Clark,* to be "clearly distinguishable on the facts" and so "inapposite in light of the unusual, factual situation presented by the record before us." *Id.* at 276. Based on this reading of the section, the *Peterson* court reversed and remanded for further proceedings.

The significant fact in *Peterson* on which later courts have relied in determining whether to apply or reject the immunity of section 702c is that, in *Peterson,* the

> flood damage was caused by Air Force personnel pursuant to instructions of engineering officers at the local base and "was wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control".

*Parks v. United States,* 370 F.2d 92, 93 (2d Cir. 1966), *quoting Peterson v. United States, supra,* 367 F.2d at 275. In *Parks,* for example, the Second Circuit declined to follow *Peterson* because the damages in *Parks* arose from negligence in the construction and operation of the Herkimer Flood Control Project.[4] *See also Callaway*

---

**4.** The courts applying the *Peterson* rationale have not required that the structure which caused the flooding be itself an integral part of a flood control project in order for the immunity to apply. Instead, it has been deemed sufficient if the structure was built in connection with or in furtherance of a flood control project. Thus, the Ninth Circuit applied the immunity granted by section 702c in *McClas-*

*key v. United States,* 386 F.2d 807 (9th Cir. 1967), in which the flooding was allegedly caused by a temporarily relocated railroad crossing that spanned a creek channel. The plaintiffs contended that the flooding would not have occurred but for the negligent selection of a rock fill crossing instead of an open trestle. The court stated:

*v. United States,* 568 F.2d 684, 687 (10th Cir. 1978).

The Fifth Circuit's decision in *Graci v. United States, supra,* explains the logic underlying *Peterson.* Plaintiffs in *Graci* sought damages for the injuries they suffered when Hurricane "Betsy" brought high winds and high waters to their property near the Gulf of Mexico. Plaintiffs alleged that they suffered flood water damage due to the negligence of the United States in the construction of the Mississippi River-Gulf Outlet, a navigational project providing a shorter route from the Gulf to New Orleans. The Outlet is a deep water channel constructed by the Corps of Engineers which is approximately 66 miles long, two-thirds of that distance cut through land, and which cuts some sixty miles from the prior route to New Orleans. During the hurricane, wind driven waters overflowed the Outlet and flooded plaintiffs' lands, resulting in the lawsuit.

After reviewing the legislative history and caselaw under section 702c, on which the United States sought immunity, the Fifth Circuit concluded that the section was intended "to place a limit on the amount of money that Congress would spend in connection with flood control programs." *Id.* at 25. Thus, the court stated:

> The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees *unconnected with flood control projects.*

*Id.* at 26. The Fifth Circuit's examination of *Peterson* and its progeny led the court to agree that section 702c "is not a bar to claims for floodwater damage caused by the negligence of the Government unconnected with flood control projects." *Id.* at 27. For

that reason, the court affirmed the denial of the United States' motion to dismiss.

The Gulf Outlet which allegedly gave rise to the injuries in *Graci* was purely a navigational aid project with no flood control features. *Id.* at 22. In *Peterson,* the dynamiting of the ice pack which allegedly brought about the downstream flooding can only be characterized as a flood control action; the Ninth Circuit states that "the decision to dynamite the ice jam was made . . . to alleviate and control the flood waters" at the Air Force Base. *Peterson v. United States, supra* at 275. Notwithstanding the flood control purpose to the decision to dynamite, the immunity of section 702c was held inapplicable because the flood damage suffered by the plaintiffs "was wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control." *Id.*

Unlike the activities at issue in *Graci,* many or, perhaps, most federal actions concerning rivers and navigable waters are multi-purpose so that one frequently cannot designate the sole justification for a given project. Obvious questions then arise as to the extent to which the immunity of section 702c is applicable to a multi-purpose project or facility when one of the purposes is flood control. Only a few courts have had occasion to focus on this point.

The initial decision worthy of discussion here is *Lunsford v. United States,* 570 F.2d 221 (8th Cir. 1977), which arose from the 1972 flooding in Rapid City, South Dakota. The *Lunsford* plaintiffs alleged that the flood was caused by experimental cloud seeding conducted by the South Dakota School of Mines and Technology under a contract with the Bureau of Reclamation of the Department of the Interior. Sued for damages under the Federal Tort Claims

Appellants contend that the case before us is distinguishable from past cases construing § 702c in that the railroad crossing did not itself constitute stream improvement or flood control works, and that § 702c must be read as granting immunity only when there has been damage as a result of negligent construction of such works as dams, dikes and levees. Relocation of the railroad was, however, necessary to the John Day Dam Project and to its stream improvement and flood control purposes, and the appellants concede that this relocation was formally specified as a part of the project. This serves to bring into operation the immunity conferred by 33 U.S.C. § 702c.

Id. at 808 (footnote omitted).

Act, the United States asserted its immunity under section 702c as an affirmative defense. Plaintiffs moved to strike the defense on the ground that section 702c applied only in connection with flood control projects. The district court denied the motion, believing itself bound to the broad definition off the immunity set forth in *National Manufacturing*, decided by the Eighth Circuit in 1954. *Lunsford v. United States*, 418 F.Supp. 1045, 1052–54 (D.S.D. 1976). The court certified the question of the applicability of section 702c to "flood damages not connected with flood control projects" for an immediate appeal to the Eighth Circuit under 28 U.S.C. § 1292(b). *Id.* at 1056.

After examining the *National Manufacturing* decision, the Eighth Circuit found it significant that the "cases upholding the immunity granted under § 702c, have all arisen out of negligence with respect to a flood control project." *Lunsford v. United States, supra*, 570 F.2d at 228. The court found support for the plaintiffs' contention that section 702c should be limited to that context, looking to the *Peterson* and *Graci* decisions on the point, but declined to decide the issue. Noting that motions to strike a defense should be granted only when the defense is insufficient as a matter of law or fact, the court declared:

> Under this standard, the defense should remain whether *National Mfg. Co.* or *Peterson* and *Graci* are followed. If *National Mfg. Co.* is followed, then the defense is sufficient as a matter of law. If *Peterson* and *Graci* are followed, then a factual determination of whether or not the damages resulted from negligence attributable to a flood control project is required to establish the defense.

> . . . . .

> No evidentiary hearing has been held. On hearing, it may develop that a flood control project materially contributed to this flood.[15] It may also develop that there is no substantial evidence that any government agency was guilty of any negligence which caused the flood. Thus, a possibility exists that the scope of immunity under § 702c does not need to be determined to decide this case.

*Id.* at 229–30 (stating in footnote 15 that the government had asserted during oral argument that "it was possible that the bursting of a dam contributed to the damages resulting from the Rapid City flood."). Having concluded that the matter should be remanded for further proceedings, the court added that, if the district court did face the question of the scope of section 702c, then "[i]t should do so with an open mind and need not necessarily feel bound by the decision in *National Mfg. Co. v. United States, supra*." *Id.* at 230. It is difficult to discern from *Lunsford* the direction that the Eighth Circuit might take if it were faced with a case directly presenting the question whether section 702c applies when flood damages arise from the operation of a multi-purpose project for purposes other than flood control. As will be discussed, the Fourth and Tenth Circuits have considered this question, reaching conflicting results.

In *Hayes v. United States*, 585 F.2d 701 (4th Cir. 1978), the plaintiff sued for damages arising from the erosion of a river bank and flooding of his farm on the Yadkin River below the Kerr Scott Dam, alleging that his injuries were caused by the operation of the dam's flood gates. Based on the purposes of section 702c, the court found it "clear" that, "if the release of the waters which allegedly damaged the farm was a consequence of the dam's operation as a flood control project, § 702c would provide the United States with absolute immunity." *Id.* at 702. On the other hand, the court noted, citing *Graci*, that the section provides "no immunity for flooding caused by a federal project unrelated to flood control." *Id.* For that reason, the court held a dismissal of the action to be improper:

> The plaintiff here alleged that the Kerr Scott Dam was a dual purpose dam designed to be operated as a flood control facility and to provide recreation for members of the public. It is not alleged why the flood gates were opened from time to time, and in its answer the Unit-

ed States did not address the subject. One may assume that all of the releases, or most of them, were incidental to the dam's operation as a flood control facility, but absolute dismissal on the basis of Rule 12(b)(6) should not be premised upon mere assumption. It is not inconceivable that all or some of the releases were solely for the purposes of promoting recreational use of the impounded waters and not in the least in aid of the operation of the dam as a flood control facility. If the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility without relation to the operation of the dam as a flood control project, he would avoid the absolute bar of § 702c.

*Id.* at 702–03. Accordingly, the Fourth Circuit reversed the district court's decision to dismiss the action and remanded for further proceedings. The court noted that, although dismissal was improper, summary judgment might be appropriate depending "upon the content of affidavits and discovered information in which the question of the purpose or purposes for which waters had been released by the dam is addressed." *Id.* at 703.

The *Hayes* decision is in direct conflict with the Tenth Circuit's ruling in *Callaway v. United States, supra,* also in 1978, in which that court was faced with floodwater damages allegedly caused by an embankment built in connection with the Waurika Dam and Reservoir project, a multi-purpose project built in part for flood control. The *Callaway* plaintiffs contended that dismissal was improper because "the trial court could not determine from the pleadings whether the flood allegedly injuring them was the type of flood for which the government is exempted from liability by 33

U.S.C. § 702c." *Id.* at 686. The Tenth Circuit rejected that argument.

The factual allegations of appellants' complaints establish that their claims are for damage done by floodwaters caused by the government's negligent construction of an integral part of a flood control project. The broad and emphatic language of § 702c belies appellants' contention that only certain types of floods occurring in connection with flood control projects are within the scope of the statute. *Florida East Coast Ry. Co. v. United States, supra.*[5] We can conceive no set of facts appellants could prove in support of their claims for which recovery would not be barred by 33 U.S.C. § 702c.

The trial court properly granted the government's motions to dismiss.

*Id.* at 687, *aff'g, inter alia, Ledford v. United States,* 429 F.Supp. 204 (W.D.Okl. 1977) (noting that the Waurika Project was authorized by Congress for flood control and other purposes), *citing* Pub.L. No. 253, 88th Cong., 1st Sess., 77 Stat. 840 (1963).

Against this background, it is now appropriate to address this court's decision in *Sanborn v. United States, supra,* a related Federal Tort Claims Act suit raising similar factual and legal considerations. Plaintiffs in *Sanborn* sought damages for injuries to their trees, crops and real property caused by excess water standing on the land in April 1974. The United States moved to dismiss based on the immunity accorded by Section 702c, but plaintiffs contended that the section did not apply, in part on the ground that the flooding causing their damage was "unrelated to a flood control project." *Id.* at 657. After examining the allegations in the complaint, this court declared:

---

5. *Florida East Coast Ry. v. United States, supra,* is one of several circuit court decisions in which the courts have held that section 702c provides immunity for damages arising "in connection with" a flood control project. These cases distinguish *Graci* and *Peterson* on the fact that those damages arose wholly unconnected with a flood control project. Although the dicta in *Florida East Coast Ry.* and the parallel cases may provide some comfort to the

United States in the instant action, those cases are not direct authority because, despite the multi-purpose nature of the projects in issue, the actual injuries arose as a result of the operation of the flood control aspect of those projects. *Id.* at 1191–93; *accord, Taylor v. United States,* 590 F.2d 263, 265–66 (8th Cir. 1979); *Lenoir v. Porters Creek Watershed District,* 586 F.2d 1081, 1084, 1086 (6th Cir. 1978).

These allegations do not clearly bring the plaintiffs' claims within the immunity. Certainly, the court can take judicial notice that the Sacramento River is included within the Central Valley Project and that the Central Valley Project has, as one of its many purposes, flood control.

However, while the pleadings suggest that the alleged damage resulted from the operation of this multi-purpose project, the pleadings are also susceptible to another theory—that the damage resulted from activity of the defendants unrelated to the operation of the Central Valley Project. Plaintiffs' allegations do not indicate the scope of the Central Valley Project, the existence or non-existence of activity by the defendants on the Sacramento River unrelated to the operation of the Project, or the location of the plaintiffs' property. Accordingly, the court cannot conclude as a matter of law that the water releases, river bed condition, and levee system condition complained of necessarily constitute allegations of misfeasance in connection with the operation of the Central Valley Project.

*Id.* at 658. This court denied the motion to dismiss because of the possibility that the activity "allegedly giving rise to the plaintiffs' damages was unrelated to a flood control project." *Id.* This court then proceeded to consider the further contention by the plaintiffs that, even if their damages had resulted from the operation of the Central Valley Project, the immunity of section 702c would not apply "unless the particular activity which caused the damage was undertaken for the purpose of flood control."

Had the plaintiffs clearly plead that their damages resulted from the operation of the Central Valley Project for one of its intended purposes, the court would grant the federal defendants' motion to dismiss. . . . Section 702c was enacted to limit the cost to the government of constructing flood control projects. Where the government participates in the construction of a multiple purpose project and one of the purposes is flood control,

and if the operation of the project is held to subject the government to liability because of nonflood control activity, the government would be subjected to additional costs because of its efforts to control floods. Such a result could be avoided only if the government used rivers and dam sites solely for flood control purposes. Such an option was certainly not contemplated by Congress because of the obvious detriment to the public welfare in view of the many functions rivers serve in modern society. Accordingly, the court must conclude that the Section 702c immunity protects the government from liability for damage caused by floods allegedly caused by the operation of a river project which has, as one of its purposes, flood control, if the action giving rise to the damage was undertaken in furtherance of one of the purposes of the multiple purpose project.

*Id.* at 659. This conclusion is consistent with the result in *Callaway* and inconsistent with that in *Hayes*, both of which were decided in the year following *Sanborn*.

The United States urges that the instant case falls directly into the *Sanborn* dicta such that this court should simply apply that dicta and grant the motion to dismiss pursuant to section 702c. The plaintiff, however, raises a number of arguments in opposition to dismissal. Initially, plaintiff urges that section 702c was not intended to encompass the seepage damages alleged in this action within the immunity provided for damages arising as a result of "floods and flood waters." Next, plaintiff asserts that the court should look to the primary purpose of the Central Valley Project, namely, reclamation, in deciding that section 702c does not apply in this instance. Further, plaintiff suggests that, even if this court were unwilling to characterize the Central Valley Project as a reclamation project outside the ambit of section 702c, the court should accord plaintiff an opportunity to demonstrate that the actions giving rise to the damages herein were largely

unrelated to flood control.[6] As an additional point, plaintiff urges that dismissal is improper because it cannot be determined at the pleading stage whether the actions leading to the injury were undertaken in furtherance of a purpose of the Central Valley Project. In support of the foregoing arguments, plaintiff raises two policy considerations: first, application of section 702c would immunize not only the United States but also the beneficiaries of the Central Valley Project at the expense of innocent third parties, and, second, application of the immunity because *one* of the Central Valley Project's purposes is flood control, even though the damages may not have arisen from a flood control activity, would eliminate the incentive to maintain a high standard of care in performing non-flood control activities. The court will now examine these contentions in depth.

## II. *Is Seepage Within the Immunity of Section 702c?*

Section 702c provides that no liability may attach to the United States "for any damage from or by floods or flood waters at any place." The question now before the court is whether the damage caused by seepage from the Sacramento River resulting from the high water level in the River, as alleged in the complaint, is a damage for which no recovery may be had by reason of section 702c. In other words, do the terms "floods or flood waters" encompass waters which have seeped through the earth rather than flowed over it? A review of cases decided under section 702c reveals that this question has not been previously considered by courts interpreting the section.[7]

The terms "floods or flood waters" are in common usage so that it is appropriate to start a consideration of their meaning with the definitions provided in Webster's New International Dictionary 970 (1939). The term "flood" is defined as "[a] great flow of water; a body of moving water; the flowing stream, as of a river; esp., a body of water rising, swelling, and overflowing land; a deluge; freshet," and as "[a] great stream of anything that flows in a steady course; as, a *flood* of light or of lava; hence, a great quantity widely diffused; a superabundance." The word "flooding" is defined as "[a] filling or becoming full with or as with some fluid, esp. to excess." By comparison, the dictionary defines the term "seepage" as the "[a]ct or process of seeping; slow percolation; oozing; a fluid, or the quantity of it, that has seeped or oozed through porous material, as soil." *Id.* at 2266.

One of the early decisions to define the terms "floods or flood waters" in section 702c is *Stover v. United States*, 204 F.Supp. 477 (N.D.Cal. 1962) (per Halbert, J.), *aff'd*,

---

**6.** The United States contended in *Sanborn* that plaintiffs' suggestion, that the section 702c immunity should not apply to water releases from a multi-purpose facility unless the releases in question were made for a flood control purpose, should be rejected:

The government argues that the rule proposed by plaintiffs would render meaningless one of the primary purposes of the immunity: the avoidance of litigation and potential liability in connection with the operation of flood control projects. This will occur, the government says, because: ". . . it is very difficult, if not impossible, as a practical matter to segregate particular acre-feet or cubic-feet-per-second of water releases into precise categories of purpose; a single release may well serve multiple purposes, just as the project itself serves multiple purposes." Government's Response to Plaintiffs' Further Memorandum, p. 3.

*Id.* at 659. This court declined to accept the argument because of the lack of evidence on the difficulty of such an undertaking. The factual question was never reached in *Sanborn*, and the decision clearly indicated that the court would rule, as a matter of law, that no recovery was permitted for damages arising from flooding derived from water releases from a multi-purpose project devoted in part to flood control no matter what the specific purpose(s) served by the particular water release allegedly causing the flooding.

**7.** The United States has pointed out that allegations of damage by reason of seepage also appear in the *Sanborn* case. In that action, however, the complaint uses the disjunctive in alleging that "'water flooded onto and/or seeped upon the property of plaintiffs.'" *Sanborn v. United States, supra* at 657 (quoting the complaint). The *Sanborn* decision does not discuss the seepage question, and this court did not consider it in ruling in that matter.

332 F.2d 204 (9th Cir.), *cert. denied*, 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964). Judge Sherrill Halbert declared in the pre-trial order that section 702c

applies to all floods[1] and flood waters which result in whole or in part from unusual or extraordinary[2] precipitation; [but the section] does not apply to "man-made floods"[3] which result solely from negligent acts.

[1] Flood, as used here, means such a quantity of escaping or flowing water as will cause damage or injury to persons or property, who but for its escape or flow would be safe from it.

[2] Unusual or extraordinary, as used here, means conditions which, in the light of experience, would not be anticipated by a normal person using ordinary care.

[3] The term "man-made flood" means a flood (as defined above) which is created *solely* by the construction or fabrication of a barrier which impounds a substantial quantity of water which, but for the barrier, would not have been impounded.

*Id.* at 482 n.14. During the trial of the case, which arose from the massive flooding in the Marysville-Yuba City area in California in 1955, Judge Halbert revised the above-quoted pretrial order to provide that section 702c applies to floods and flood waters resulting in whole or in part from unusual or extraordinary *climatic conditions*, rather than precipitation. He explained: "This was done in response to the evidence concerning saturation of the soil, the amount and location of snow, the speed with which the snow melted, and wind conditions." *Id.* at 482. In addition, Judge Halbert considered possible redefinitions of the term "flood," in order to place "particular emphasis on the fact that a flood involves water where it *ordinarily* would *not* be *expected* to be." *Id.*

In further defining the meaning of the phrase "floods or flood waters," the *Stover* decision stated:

waters which overflow the natural banks of a river, but which remain contained by a levee system, which prevents them from spreading out over the countryside and causing untold amounts of damage, are as much "flood waters" as those which escape and actually do damage.[15]

The basic element of a "flood" is the fact the waters are out of their natural channel. Whether or not a flood or flood waters cause damage is a question entirely separate and apart from the question of whether in fact a flood exists.

[15] Expert testimony has been received (and common sense supports the same conclusion) to the effect that "if a flood occurs when water escapes from the stream channel, then when man provides levees to contain the water in the channel * * * we should also consider it a flood if water is actually kept in the channel by the levees. * * * [I]f the water in the channel does rise out to the levees * * * it is a flood." The expression "rising out to the levees" means a situation where the water level in the stream rises so that it is being held from spreading out because of the levees. In other words, the water has risen to such a point where it would normally inundate the surrounding countryside, but in the particular situation is restrained from doing so by the levees. This, of course, presupposes that the levees are built so as to overlook the land in its natural state.

. . . . .

*Id.* at 483 & n.15. Judge Halbert concluded that, as a matter of law, a "flood" constitutes "water which inundates an area of the surface of the earth where it ordinarily would not be expected to be" and the term "flood water" includes "[w]ater which has overflowed the natural banks of the stream in its natural channel, and which is contained by a system of levees." *Id.* at 485. Under the *Stover* definition, then, if the elevation of the Sacramento River in the area of plaintiff's ranch was maintained at a level higher than the natural banks of the River *only* by levees or similar barriers, then those waters which were contained by the levees or barriers constituted "flood waters" under section 702c.

On appeal from the judgment entered by Judge Halbert denying the *Stover* plaintiffs' claims for damages, the Ninth Circuit affirmed. The court held that section 702c "is an immunity statute covering even ordinary negligent construction or maintenance of flood works." *Stover v. United States, supra,* 332 F.2d at 206. The court rejected the distinction drawn between man-made floods and other floods, holding that section 702c barred recovery even when the flood is caused solely by negligence.

Over a decade later, the Fifth Circuit drew heavily from Judge Halbert's decision in *Stover* in considering the definition of "floods or flood waters" in *Florida East Coast Ry. v. United States, supra.* The plaintiff railroad had been injured by the washout of its tracks in the swampy area encompassed by the Central and Southern Florida Flood Control Project, a congressionally approved project intended to control high water conditions during the rainy season and to impound water in Lake Okeechobee for use in the dry season. The district court held that the United States was immune under section 702c, and the Fifth Circuit was presented with plaintiff's contention that

the conditions of section 702c immunity were not met here because the washouts were not caused by "floods or flood waters" as required by the Act. Instead, claims the railroad, the washouts were caused by rapid surface water runoff drawn under the roadbed and into the negligently designed and negligently built interceptor canals.

*Id.* at 1192. The court rejected that argument, noting that section 702c was intended, in the words of *National Manufacturing*, to grant immunity in " 'the broadest and most emphatic language.' " As the court commented, "Congress did not limit this immunity to damage done directly by inundation, but provided for immunity also from damage resulting 'from . . . flood waters.' " *Id.*

The Fifth Circuit noted that the damages at issue occurred adjacent to the federally funded flood control project as a result of its design and operation. One of the factors contributing to the incident was a rainfall heavy enough that the entire area was declared a flood disaster area. Relying on Judge Halbert's decision, the court stated:

In *Stover v. United States*, the trial judge defined a flood as "water which inundates an area of the surface of the earth where it ordinarily would not be expected to be," and as "[w]ater which has overflowed the natural banks of the stream in its natural channel . . . ." The railroad reasons that because the water that caused the damage was not overflow water from the interceptor canals, it was not flood water at all, but surface water. The *Stover* definition, however, is not restrictive; the term "floods and flood waters" as used in section 702c is sufficiently comprehensive to encompass the extraordinary rising of waters even in a place where water may often be found, such as the swampy area around the K-line [the track subject to the washout]. This is particularly true when the site of the rising waters is within a larger region designated a flood disaster area. In [the washouts] the damage done to the railroad, though not the result of inundation of the line itself, resulted from the presence of flood waters around its roadbed.

It does not seem reasonable to hold that Congress intended to create immunity for damages which occur when waters within a flood control area leave their normal course, but at the same time intended to permit liability for damage from the increased flow of flood water through its normal channels. Yet, to sustain the railroad's argument would require us to so interpret section 702c. This we decline to do.

*Id.* at 1192–93 (footnotes omitted). On this reasoning, the Fifth Circuit affirmed the district court's conclusion that the United States is immune under the circumstances presented.

There is only one other decision under section 702c to analyze in any depth the meaning of the terms "floods or flood waters," namely, the Eighth Circuit's decision in *Taylor v. United States*, 590 F.2d 263 (8th Cir. 1979). The *Taylor* plaintiffs owned a farm adjoining the Yellowstone and Missouri Rivers in North Dakota. The farm property was located upstream from the Garrison Dam and Lake Sakakawea, the reservoir created by Garrison Dam; four other dams were located downstream from the Garrison Dam. A sixth dam, the Ft. Peck Dam, was situated upstream from the Garrison Dam and plaintiffs' farm. These six dams were operated together for multiple purposes, including flood control, irriga-

tion, navigation, hydroelectric power generation, water quality improvement, recreation, and fish and wildlife enhancement. *Id.* at 265.

In June 1975, unusually heavy rainfall caused severe flooding along many of the tributary streams of the Missouri River. During that summer, impounded waters of Lake Sakakawea backed up onto plaintiffs' property; the accumulated waters damaged over 150 acres of crops. When plaintiffs filed their action for damages, the United States responded with a motion for summary judgment asserting absolute immunity under section 702c. When the district court denied the motion, the United States appealed to the Eighth Circuit which reversed.

The *Taylor* plaintiffs contended that their situation was outside the scope of section 702c because the water which caused the damage was backwater, not flood water. Their position was that section 702c did not provide immunity from the tort of trespass by backwater impoundment. Assuming plaintiffs' allegations to be true, the court defined "backwater" as "a body or accumulation of water resulting from an obstruction or opposing current," and adopted the *Stover* district court definition of "floods or flood waters." *Id.* at 266–67. The plaintiffs asserted that

> over a period of time the Garrison Dam obstructed sufficient water such that Lake Sakakawea was filled close to or at the maximum level. When the rains in June came, the additional water was impounded in the lake, took on the identity of backwater as opposed to floodwater, and increased the level to the point where backwater settled upon the Taylors' property.

*Id.* at 267. The Eighth Circuit rejected the validity of the suggested distinction between backwater and floodwater, finding that the facts presented fell within the compass of section 702c.

> We can see no rational distinction between floodwaters and backwaters that would lead to a different result in this case. The most favorable chain of events that we can presume is that the water

already impounded in Lake Sakakawea was backwater. The rains of June were negligently impounded beyond the maximum operating level, which pushed the previously existing backwater onto the Taylors' property. To presume such a distinction is difficult enough, but it still does not escape the breadth of section 702c immunity. As we stated in *National Mfg. Co. v. United States supra,* . . . section 702c "bars liability for damages that result (even indirectly) 'from' floods." Thus, even if it was backwater that damaged the Taylors' property, and even if section 702c would not cover "backwater" per se, the backwater was pushed onto the Taylors' property "in whole or in part from unusual or extraordinary climatic conditions." *Stover v. United States, supra* . . . . .

*Id.* Having concluded that there existed no set of facts under which plaintiffs could avoid the scope of the section 702c immunity, the Eighth Circuit remanded with instructions for the district court to enter summary judgment for the United States. *Id.*

■ The question before this court is whether the immunity granted by section 702c encompasses the factual circumstances presented in this action, namely, damages resulting from seepage which has occurred through either the natural banks or the levees which elevate the natural banks along a river system integrated into a major flood control project due to maintenance of high water levels in the river. Unlike the backwater in *Taylor* or the surface waters in *Florida East Coast Ry.*, the waters causing damage in this instance are alleged to be percolating underground or subsurface waters. Nonetheless, the waters at issue fit into the most general of the *Stover* definitions of a flood, namely, "water where it ordinarily would not be expected to be." The cases decided under section 702c do not provide direct guidance as to the proper result to be reached when the water causing damage is subsurface seepage. Under these circumstances, a court may look for guidance to the analo-

gies that may appear under other statutes and/or may rely on the policy and purpose of the law. An examination of the available analogous authority does not lead to any clearcut guidance although a few cases and regulations can be read to indicate that seepage might properly fall within the meaning of the term "flood." [8] Under these circumstances, the court must fall back to the policy of section 702c to rule on the issue.

As was discussed in the opening portion of this decision, Congress intended in enacting section 702c to insure that the United States would be entirely free from liability for damages which might arise by reason of the construction of flood control works even when those damages might have been caused by governmental negligence in the construction, maintenance or operation of those works. *Peterson v. United States, supra* at 275–76. Thus, to repeat the explanation given by the Eighth Circuit,

> [Section 702c bars] liability of any kind from damages "by" floods or flood waters but it goes further and in addition it bars liability for damages that result (even indirectly) "from" floods. The use of the word "from " in addition to "by" makes it clear that the bar against federal liability for damages is made to apply whenever floods or flood waters have been substantial and material factors in destroying or damaging property. . . . [U]niformly and throughout the country at any place where there is damage "from" or "by" a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United State therefor.

*National Manufacturing Co. v. United States, supra* at 271. In view of the controlling precedents discussed above, it is logical to conclude that, if the river waters that seeped onto plaintiff's property were "floods" or "flood waters" within the *Stover* definition, then the seepage water which caused plaintiff's injury must be deemed to be "floods or flood waters" within the meaning of section 702c.[9] In other words, seepage damage cannot give rise to liability on the part of the United States when the seepage results from the presence of flood waters in the Sacramento River which derive from a federal flood control project. Plaintiff cannot escape the immunity from liability afforded by section 702c by reason of the fact that the injury arose from seepage waters percolating through the ground instead of waters flowing on the surface of the land.

III. *Application of Section 702c to a Multi-Purpose Reclamation Project*

Plaintiff's next contention is that section 702c is intended to limit the potential liability of the United States only in connection with flood control projects or projects undertaken for the primary purpose of flood control. With that premise, plaintiff argues that the Central Valley Project is a reclamation project under the control of the Bureau of Reclamation, with only a subsidiary flood control purpose, and that section 702c is therefore inapplicable.

In plaintiff's view, the projects immunized by section 702c are those authorized and carried out pursuant to chapter 15 of Title 33, the chapter of which section 702c is a part, under the supervision of the Secretary of the Army. After a review of the cases applying section 702c, plaintiff con-

---

**8.** *See, e. g.,* 42 U.S.C. § 4121(a)(1); *United States v. Kansas City Life Insurance Co.,* 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); *Ketcham v. Modesto Irrigation District,* 135 Cal.App. 180, 26 P.2d 876 (1933); *Willadsen v. Crawford,* 75 S.D. 161, 60 N.W.2d 692 (1953); 24 C.F.R. § 1909; 33 C.F.R. § 208.10; *cf. Barnes v. United States,* 538 F.2d 865, 210 Ct.Cl. 467 (1976).

**9.** It should be noted that the briefing filed by the parties and the foregoing analysis by the

court both assume that the water flowing at "high elevations" in the Sacramento River which seeped onto plaintiff's property was "flood water" within the meaning of section 702c before it seeped from the natural river channel. The allegations of the complaint are wholly consistent with such an assumption. Nonetheless, the court makes no finding as to the preliminary question whether the water in the River was "flood water."

cludes that "the courts have extended the statute to all flood control projects constructed and operated by the Army Corps of Engineers." Plaintiff's Brief, filed Sept. 19, 1977, at 4. The United States contends that the immunity of section 702c clothes all projects which include flood control as one of their purposes, even if flood control is not a major purpose. The section does not, as the Government points out, refer to the primary purpose of the federal activity in its declaration that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place . . . ." Moreover, the United States urges that the immunity is not lost because the Bureau of Reclamation, rather than the Army Corps of Engineers, is primarily responsible for the management of the multi-purpose dams and reservoirs which are part of the Central Valley Project.

Plaintiff concedes that flood control has been and is one of the purposes for the construction and maintenance of the Central Valley Project but urges that flood control was not and is not a major purpose. In support, plaintiff notes:

> By letter dated November 26, 1935, Secretary of the Interior Ickes reported to the President, in accordance with requirements of the Act of Dec. 5, 1924 (relating to irrigation projects), that the CVP would pay for itself. He noted that the project had significant irrigation and power generation potential, and that of a proposed $170,000,000 cost, "national navigation and flood values of the project have been found by the War Department to be $12,000,000 . . ." (Engle, *Central Valley Project Documents*, Part I, Authorizing Documents, U.S. Government Printing Office, 1956, p. 567). By 1946, the project was estimated to cost $384,314,000, of which $31,444,000 was allocated to flood control ("Report on the Engineering Feasibility, the Total Estimated Costs, and the Allocation and Probable Repayment of These Costs, of the Central Valley Project, California", dated August 6, 1946, reproduced at *Central Valley Project Documents*, Part I, p. 578 et seq.).

*Id.* at 7.[10]

Based on this analysis, plaintiff contends that the governing precedent is the Fifth Circuit's decision in *Graci v. United States, supra,* which followed the Ninth Circuit's approach in *Peterson v. United States, supra.* In *Graci* and *Peterson,* the section 702c immunity was inapplicable because the floodwater damage was unconnected with any flood control project. The reasoning of those cases should apply, in plaintiff's view, notwithstanding the partial flood control purpose of the Central Valley Project, because the court should look to the predominant objectives of the project when a multi-purpose project is in issue.

As an initial matter, plaintiff's contention that flood control plays only a minor role in the Central Valley Project must be examined in the light of the legislative and historical background of the project. The Senate Report prepared during the initial stages of federal participation in the Central Valley Project gives a brief recitation of federal flood control efforts in the valley as well as a statement of the objectives for federal involvement:

> The Federal Government has been interested in flood control on the Sacramento and San Joaquin Rivers since 1893 when Congress passed the so-called Caminetti Act creating the California Debris Commission. This commission prepared a plan for controlling floods on the Sacramento River in 1910 [which] was adopted

---

10. In a later brief, plaintiff provides additional statistics on the point:

> the cost allocation on the [Central Valley Project] shows that financially [flood control activities] are minor. In the cost allocation that supported the tentative power rate adjustment proposed in 1975, the allocation to flood control was about $192 million, and for navigation $5.6 million, out of a total cost of $3.3 billion, or 6% and .2%, respectively. Sales to project beneficiaries of water and power bring in almost $2.8 billion annually, and [both commodities are produced] at cheaper rates than they are available from any other current source.

Plaintiff's Brief, filed Oct. 28, 1977, at 5.

by Congress in 1917 and is nearly completed at the present time. When completed, it will involve a cost of over $51,000,000, of which $17,600,000 is to be furnished by the Federal Government in accord with the flood control act of 1928

. . . .

Engineering studies demonstrate that the flood flows for which the Sacramento Flood Control project is designed may be exceeded with frequencies of from once in 14 to once in 55 years in different parts of the control works. Experience on the · Mississippi River and other streams has shown conclusively that larger floods than have been previously experienced over a long period of years may be expected to occur. Such floods when they do occur in a region which is highly developed cause great damage and this damage increases where the area which may be flooded becomes more intensely developed and improved. The lands which are subject to flooding in the Sacramento and San Joaquin valleys are already highly developed and improved and will continue to be developed more intensively in future years. It is therefore most desirable that provisions be made for obtaining the maximum degree of flood protection which can be practicably effected.

One of the important proposed objectives of the great central valley project of California is the provision of additional flood protection on the Sacramento and San Joaquin Rivers by the regulation of floods in the two proposed major storage reservoirs, Kennett Reservoir [now called Shasta Reservoir] on the Sacramento River and Friant Reservoir on the San Joaquin River. . . . The operation of these reservoirs will . . . be of material benefit in the interest of flood control, not only in decreasing the amount of damages but also in protecting and insuring the large investment which has already been made in flood-control works. S.Rep. No. 1325, 72d Cong., 2d Sess. (1933), *reprinted in* Central Valley Project Documents, 84th Cong., 2d Sess., House Doc. No. 416, Part I, 487, 499–500 (1956). That report referred to the "four major and important purposes" of the Central Valley Project, namely, irrigation, navigation, flood control, and hydroelectric power. *Id.* at 501. The wealth of federal legislation concerning flood control on the Sacramento River both before and after the inception of federal involvement in the Central Valley Project attests to the significance of the flood control aspects of federal facilities on the River.[11]

11. A partial list of the statutes governing early flood control efforts on the Sacramento River prior to the initiation of the Central Valley Project and the early enactments concerning flood control facilities in the Central Valley Project includes the following Acts. Act of Mar. 4, 1915, ch. 142, § 15, 38 Stat. 1049, 1055, 1061; Act of Mar. 1, 1917, ch. 144, § 2, 39 Stat. 948, 949–50; Act of July 1, 1918, ch. 113, 40 Stat. 634, 661; Act of Mar. 2, 1919, ch. 95, 40 Stat. 1275, 1285; Act of July 19, 1919, ch. 24, 41 Stat. 163, 188; Act of Mar. 4, 1921, ch. 161, 41 Stat. 1367, 1391; Act of Sept. 22, 1922, ch. 427, § 12, 42 Stat. 1038, 1043, 1046; Act of Mar. 2, 1923, ch. 178, tit. II, 42 Stat. 1377, 1421; Act of June 7, 1924, ch. 291, tit. II, 43 Stat. 477, 516; Act of Feb. 12, 1925, ch. 225, tit. II, 43 Stat. 892, 930; Act of Mar. 3, 1925, ch. 467, § 8, 43 Stat. 1186, 1191, 1196; Act of Apr. 15, 1926, ch. 146, tit. II, 44 Stat. 254, 292; Act of Jan. 21, 1927, ch. 47, 44 Stat. 1010, 1014; Act of Feb. 23, 1927, ch. 167, tit. II, 44 Stat. 1106, 1143; Act of Mar. 23, 1928, ch. 232, tit. II, 45 Stat. 326, 359; Act of May 15, 1928, ch. 569, § 13, 45 Stat. 534, 539; Act of Feb. 28, 1929, ch. 366, tit. II, 45 Stat. 1349, 1381; Act of May 28, 1930, ch. 348, tit. II, 46 Stat. 432, 462–63; Act of Feb. 23, 1931, ch. 279, tit. II, 46 Stat. 1277, 1307; Act of July 14, 1932, ch. 482, tit. II, 47 Stat. 664, 694; Act of Mar. 4, 1933, ch. 281, tit. II, 47 Stat. 1571, 1599; Act of May 15, 1936, ch. 404, tit. II, 49 Stat. 1278, 1306–07; Act of June 22, 1936, ch. 688, §§ 1–2, 6, 49 Stat. 1570, 1570–71, 1592–97; Act of Aug. 26, 1937, ch. 832, §§ 1–2, 50 Stat. 844, 849–50; Act of Aug. 9, 1939, ch. 633, tit. I, 53 Stat. 1301, 1328; Act of June 24, 1940, ch. 415, 54 Stat. 505, 508; Act of Oct. 17, 1940, ch. 895, § 2, 54 Stat. 1198, 1200; Act of Aug. 18, 1941, ch. 377, § 3, 55 Stat. 638, 647; Act of Apr. 28, 1942, ch. 246, 56 Stat. 219, 222; Act of June 2, 1943, ch. 115, 57 Stat. 93, 96; Act of June 26, 1944, ch. 275, 58 Stat. 327, 330; Act of Dec. 22, 1944, ch. 665, §§ 1–10, 58 Stat. 887, 887–92, 900–01; Act of Mar. 31, 1945, ch. 45, 59 Stat. 39, 42; Act of May 2, 1946, ch. 247, 60 Stat. 160, 163–64; Act of July 24, 1946, ch. 595, 60 Stat. 634, 636, *applying provisions of* Act of Mar. 2, 1945, ch. 19, 59 Stat. 10; Act of July 31, 1947, ch. 411, 61 Stat. 686, 690; Act of June 25, 1948, ch. 655, 62 Stat. 1019, 1022; Act of Oct. 13, 1949, ch. 688, 63 Stat. 845, 849; Act

Examination of documents prepared in connection with the Central Valley Project by various administrative agencies and submitted to Congress reveals a major dichotomy between the Department of the Interior (with its subsidiary agency, the Bureau of Reclamation) and the Department of War (with its subsidiary, the Army Corps of Engineers). The Interior Department/Bureau of Reclamation documents stress the "reimbursable" aspects of the Central Valley Project, namely, hydroelectric power supply and water supply for irrigation and municipal and industrial uses. Thus, a letter to President Truman from Secretary of the Interior Krug, dated December 3, 1946, transmitting a report on the project stresses the Department's view that the project will be self-sustaining financially and adopts an allocation of costs connected with the project which assigns a very limited role to flood control and to the other non-reimbursable aspects of the project. After confidently declaring that "the returnable and repayable allocations, together with the allocations to flood control and navigation, equal the total estimated cost of the project," the Secretary's letter admits that the "Secretary of War has not concurred fully in these allocations" for flood control and navigation. Letter of Transmittal from Secretary of the Interior J. A. Krug to President Harry S Truman, Dec. 3, 1946, *reprinted in* Central Valley Project Documents, *supra* at 575, 577. Federal legislation addressing the Central Valley Project demonstrates that, once the United States made a commitment to undertake construction and operation of the Project, the government proceeded vigorously.[12]

Any examination of the documents prepared by the Secretary of the Interior and the Bureau of Reclamation reveals the consistent view taken by those agencies that the predominant purpose of the Central Valley Project is reclamation and that the major activities of the project are supplying water and power. A very different view appears when the opinions of the Secretary of War are considered. The Secretary of War summarized the views and recommendations of the War Department in a letter to the Secretary of the Interior commenting on the report whose transmittal occasioned the letter discussed in the previous paragraph. The Secretary stated:

I also differ seriously with your contention that the authorized reservoirs of the Department are predominantly for irrigation. Predominant interest is not susceptible of precise mathematical analysis for several reasons. Among these are the various ways in which benefits are computed. My belief that flood control is the predominant interest in these projects is strongly supported by the overwhelming agreement of testimony presented to the committees of Congress during a long session of open hearings at which the congressional delegation from the Sacramento-San Joaquin Basin, many public bodies, and numerous private individuals testified repeatedly that the projects are needed for flood control and are desired now because of the urgent need for flood control, and that other benefits are of secondary importance.

of Sept. 6, 1950, ch. 896, tit. IX, 64 Stat. 595, 728; Act of Sept. 26, 1950, ch. 1047, §§ 1–5, 64 Stat. 1036, 1036–37; Act of Oct. 24, 1951, ch. 556, 65 Stat. 616, 619; Act of July 11, 1952, ch. 659, 66 Stat. 579, 581.

12. A partial list of the relevant early statutes concerning the reclamation aspects of the Central Valley Project generally and the statutes appropriating funds for and authorizing the multi-purpose Shasta and Keswick Dams includes the following enactments. Act of June 22, 1936, ch. 689, tit. III, 49 Stat. 1597, 1622; Act of Aug. 9, 1937, ch. 570, 50 Stat. 564, 597; Act of May 9, 1938, ch. 187, 52 Stat. 291, 324; Act of May 10, 1939, ch. 119, 53 Stat. 685,

718–19; Act of Apr. 6, 1940, ch. 77, tit. I, 54 Stat. 82, 87; Act of June 18, 1940, ch. 395, 54 Stat. 406, 438–39; Act of June 28, 1941, ch. 259, 55 Stat. 303, 336; Act of Dec. 17, 1941, ch. 591, tit. III, 55 Stat. 810, 826–27; Act of July 2, 1942, ch. 473, 56 Stat. 506, 536; Act of July 12, 1943, ch. 219, 57 Stat. 451, 476; Act of July 3, 1945, ch. 262, 59 Stat. 318, 339, 342; Act of Dec. 28, 1945, ch. 589, tit. I, 59 Stat. 632, 647–48; Act of July 1, 1946, ch. 529, 60 Stat. 348, 365, 367; Act of July 25, 1947, ch. 337, 61 Stat. 460, 474–75; Act of Dec. 23, 1947, ch. 524, 61 Stat. 941, 944; Act of June 29, 1948, ch. 754, 62 Stat. 1112, 1127, 1129.

Krug, Central Valley Basin: A Comprehensive Report, S.Doc. No. 113, 81st Cong., 1st Sess. 276 (1949), *reprinting* Letter from Secretary of War Robert P. Patterson to Secretary of the Interior J. A. Krug, Feb. 15, 1946. Secretary of War Patterson stressed his dissatisfaction with the benefit/cost computations of the Interior Department:

> the evaluation of irrigation benefits as the gross increase in crop value on land brought under irrigation is not an economically sound and valid method of approach. It does not take into account other costs which contribute to the higher crop value, and in fact can easily show disproportionately high ratios of benefits to costs whereas actually the agricultural operation may cause heavy monetary losses each year. It is noted also that the gross increase in crop value is used in computing irrigation benefits, whereas net benefits are used in determining flood-control and power benefits. This variation in method is inconsistent. The War Department takes the position that control of spring and summer floods produces definite flood-control benefits and that they should be recognized as such.

*Id.* at 276–77.

The Bureau of Reclamation had a ready explanation for the emphasis placed on the flood control aspects of the project by the congressional delegation for the Central Valley and by various witnesses:

> All of the witnesses wanted the reservoirs, whether for irrigation, flood control, or power, and all knew that the greater the final allocations to flood control the smaller the payment would be for the reimbursable irrigation and power functions, since flood-control costs are nonreimbursable under the law and costs for irrigation and power must be repaid.

Central Valley Project Documents, *supra* at 995–96. The witnesses and the congressional delegation were not the only ones who had a reason to emphasize the importance of one of the purposes of the project over the competing purposes. A review of the documents prepared by the two agencies involved—the Department of the Interior/Bureau of Reclamation and the War Department/Army Corps of Engineers—reveals the ongoing dispute between the agencies as to which of them would construct, maintain and control the dams and other structures of the Central Valley Project. In June 1945, the President requested the two agencies to set forth a statement of their differences on the development of the project. The joint statement prepared by the Bureau of Reclamation and the Corps of Engineers in 1948 explains that, although the two agencies were in essential agreement as to the physical features to be incorporated in the plans for development,

> there are differences between the two agencies as to the primary function of the multiple-use reservoirs common to both of the plans. The Corps of Engineers holds that these multiple-use reservoirs, together with the reservoirs planned for flood control only and the planned local flood protection works, are essential parts of a comprehensive flood-control plan . . . . The Bureau of Reclamation, on the other hand, considers that these same multiple-use reservoirs are a part of its long-range plan for irrigation and related water uses and that the primary function of each reservoir is the same as the primary functions which dominate that plan, i. e., irrigation.

Central Valley Project Documents, *supra* at 1052. The joint statement focuses on the essence of the dispute in the following passage:

> the Chief of Engineers contemplates the coordinated operation of the system of flood control reservoirs by the Corps of Engineers in close cooperation with the Bureau of Reclamation and with local interests concerned. . . . On the other hand, the Commissioner of Reclamation contends that coordinated operation of all multiple-use reservoirs by a single Federal agency is essential and that the Bureau of Reclamation should be that single agency. . . . [T]he Corps of Engineers considers that operation of all reservoirs in the Sacramento-San Joaquin River Basin by the Bureau

of Reclamation is neither necessary nor desirable . . . .

*Id.* at 1053–54.[13]

The dispute between the Bureau of Reclamation and the Army Corps of Engineers was ultimately resolved, although not to the satisfaction of either agency. A formula was worked out whereby the multiple purpose dams in the Central Valley Project became the responsibility of the Bureau of Reclamation, subject to the regulations of the Corps of Engineers governing the flood control aspects of those dams, *see* 33 C.F.R. § 208.11, and the dams and other portions of the Project which are intended solely for flood control are the exclusive responsibility of the Corps of Engineers. *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 733–34, 70 S.Ct. 955, 959–60, 94 L.Ed. 1231 (1950), *citing* Letter of President Truman to the Secretary of the Interior, Aug. 15, 1949, S.Doc. No. 113, 81st Cong., 1st Sess. (1949). Thus, the Corps of Engineers specifies the operating standards under which a multiple purpose dam like Shasta Dam must be maintained in order to fulfill the dam's flood control purpose; the Bureau of Reclamation is obligated to conform to those standards. The Bureau may take such other actions not in conflict with the operating standards as may fulfill one or more of the other purposes for which the dam was built. With minor accommodations, the basic divi-

sion of responsibility adopted in 1949 has been followed to the present time.

 Plaintiff seeks to use the fact that the Bureau of Reclamation is primarily responsible for the operation of the Central Valley Project as a whole and for the operation of Shasta and Keswick Dams and the Trinity River Division in particular to except those portions of the Project from the immunity provided in section 702c. It cannot be denied that section 702c is codified as part of a chapter addressing the activities of the Corps of Engineers. This fact alone does not dictate the conclusion plaintiff seeks, namely, that the immunity clothes only those projects operated by the Corps of Engineers and does not apply to the portions of the Central Valley Project operated by the Bureau of Reclamation.[14] Initially, it must be recognized that both the Bureau and the Corps were intimately involved in the development of the Central Valley Project and the particular portions of the Project at issue in this litigation. *See generally* nn.11 & 12 (collecting many of the relevant statutes). Moreover, the congressional and executive documents evidencing the allocation of authority over the Project and its component parts do not reflect any intention that the designation of the Bureau of Reclamation as the agency primarily responsible for the multi-purpose facili-

13. *See also* Letter from Secretary of the Interior Harold L. Ickes to L. General Raymond A. Wheeler, Chief of Engineers, dated Jan. 22, 1946, *reprinted in* Central Valley Project Documents, *supra* at 1105, 1108. This letter states:

> I regard it as unfortunate that the Corps of Engineers, War Department, has been authorized to construct a number of multiplepurpose dams in the Central Valley Basin. . . . [T]he very authorization to the Army engineers to build such multi-purpose structures has given rise to considerable administrative difficulty already, and will, unless appropriate steps are taken, lead inevitably to further difficulties of the same kind.

14. The court declines to adopt plaintiff's suggestion that the codification of section 702c as part of chapter 15 of Title 33, United States Code, a chapter devoted primarily to provisions concerning flood control, should be interpreted to limit the immunity of section 702c to those flood control projects under the management of the Army Corps of Engineers. First, the provi-

sions of chapter 15 envision multi-purpose projects and the incorporation of flood control features into projects intended to further comprehensive and coordinated development of the Nation's waterways. As a second point, however, the nature of the enactments codified to chapter 15 is not determinative. Title 33, which is devoted to the general subject matter of navigable waters, and the other two Titles that include statutes relevant to the Central Valley Project—Title 16 and Title 43, addressing conservation and public lands, respectively—have not been enacted into positive law. See 1 U.S.C. § 204. When portions of the United States Code have not been enacted into positive law, the court should not construe statutory intent based on the context of the arrangement selected by the codifier. *See United States v. Welden,* 377 U.S. 95, 98 n.4, 84 S.Ct. 1082, 1085, 12 L.Ed.2d 152 (1964); *Warner v. Goltra,* 293 U.S. 155, 160–62, 55 S.Ct. 46, 48–49, 79 L.Ed. 254 (1934).

ties in the Project should alter the applicability of section 702c. The documents are silent on the point. Any court is hesitant to draw conclusions from congressional silence. Nevertheless, that silence is consistent with the conclusion that no alteration in the applicability of section 702c was intended by the allocation of authority over the Central Valley Project. This court cannot find support for the conclusion that the executive allocation of responsibility acceded to by Congress was intended to remove the cloak of immunity that shielded the Central Valley Project. In addition, this court cannot accept the contention that flood control was an unimportant or relatively minor consideration in the initiation and development of the Central Valley Project. The statistics on which plaintiff relies were prepared by the Bureau of Reclamation, an agency which had a significant self-interest in emphasizing the hydroelectric power and irrigation aspects of the Project and in minimizing the flood control and navigation benefits. The alternative statistics prepared by the Army Corps of Engineers suffer from the same lack of reliability. For this reason, the court will not attempt to designate a hierarchy of importance to the various purposes served by the Central Valley Project and its component parts. The legislative evidence is sufficient, however, to justify the conclusion that flood control has historically been and remains a significant aspect of the Central Valley Project.

Plaintiff next argues that, even if the court were not to accept the contention that section 702c applies only to flood control projects operated by the Army Corps of Engineers, the fact that a significant percentage of the costs incurred in the operation of the Project are reimbursable under the federal reclamation law must be considered. In plaintiff's view, the reimbursements that the federal government receives for its expenditures on reclamation projects constitute a fundamental difference between the flood control projects immunized by section 702c and the reclamation projects to which section 702c should not apply. Plaintiff states:

[Central Valley] Project customers pay for project works, amortized over a forty year period and reimburse the government for the costs of maintenance and operation. . . . Although Congress may have intended to limit the government's exposure to damages on nonreimbursable projects, it did not seek to do so in this largely reimbursable one, where project costs, including damages of the kind here sought, could be recovered through inclusion in the repayment schedules.

Plaintiff's Brief, filed Sept. 19, 1977, at 4. In a subsequent brief, plaintiff urges that application of section 702c's immunity to a reclamation project improperly discriminates among the users of utility services:

Just as a purchaser of utility services pays the cost of tort liability to PG&E, SMUD, and the City of Sacramento, so [should] the utility users from the federal project. Otherwise the result is to discriminate among the users of utility service, and unfairly place the burden of an activity negligently conducted on one who does not benefit from that activity.

Plaintiff believes that the evidence will show that if the defendant kept its reservoir too full, for the benefit of the irrigator and the power user, so that harm resulted to an innocent third party, neither the general taxpayer who finances the flood control features of the project nor the innocent third party must withstand the loss, but only the irrigation water and power user who stood to benefit by the activities; that mechanics exist for such transfer of costs, and that Congress knew they existed. Certain it is that all the other applicable costs of the project are allocated to them, and that Congress has considered the matter of cost allocation on recent occasions.

Plaintiff's Brief, filed Oct. 28, 1977, at 4. The significant flaw in this otherwise persuasive argument is that plaintiff does not cite and this court cannot find support for the proposition that Congress intended the reimbursable costs of the Central Valley Project to include payments for damages incurred by downstream riparian owners as

a result of floods or flood waters. In the absence of such expressed congressional intent, this court cannot redefine the reimbursable costs of the Central Valley Project. This argument can properly be presented to Congress, but it cannot form the basis for this court's action.[15]

In sum, this court holds that the immunity provisions of section 702c apply to damages from or by floods or flood waters arising from the operation of the Central Valley Project as a whole and to the multi-purpose dams and other facilities which are part of the Project notwithstanding the fact that the Bureau of Reclamation is primarily responsible for the Project and those facilities insofar as they are not exclusively designed for flood control. This court's review of the numerous relevant statutes governing the Central Valley Project, their legislative history, and the concurrent administrative documents has not revealed support for a limitation of section 702c to projects operated by the Army Corps of Engineers or to nonreimbursable projects generally.

Having held that section 702c applies to the Central Valley Project, this court must now turn to plaintiff's contention that the immunity of section 702c clothes the Project only when the Project is operated in furtherance of its flood control purpose.

IV. *Limitation of Section 702c Immunity to Activities in Furtherance of Flood Control*

As a further basis for denial of the United States' motion to dismiss, plaintiff urges that, even if section 702c is applicable to the Central Valley Project insofar as the Project is operated in furtherance of its flood control purpose, the section does not provide immunity from damages arising from the operation of the Project in furtherance of its other purposes. Thus, plain-

tiff contends that the motion to dismiss cannot be granted because, taking the allegations of the complaint as true, this court cannot determine the particular purpose or purposes served by the operation of the Central Valley Project that caused plaintiff's injury.

As discussed in the opening portion of this Opinion, this court has previously commented in dicta on this issue in *Sanborn v. United States, supra.* In that decision, the court declared that a motion to dismiss would properly be granted if the complaint clearly alleged that the damages resulted from the operation of the Central Valley Project for one of its intended purposes. *Id.* at 658. Rejecting the *Sanborn* plaintiffs' contention that section 702c should immunize the United States only if the particular activity that caused the damage was undertaken for the purpose of flood control, this court reasoned:

> Section 702c was enacted to limit the cost to the government of constructing flood control projects. When the government participates in the construction of a multiple purpose project and one of the purposes is flood control, and if the operation of the project is held to subject the government to liability because of non-flood control activity, the government would be subjected to additional costs because of its efforts to control floods.

*Id.* at 659. This reasoning is based on the policy inherent in section 702c that the expenditure of federal funds for flood control is conditioned on federal non-liability for damages from or by floods or flood waters. *Clark v. United States, supra* at 452. Two considerations flow from that policy. First, the preparation and presentation of proof establishing the applicability of section 702c immunity are costs intended to be minimized by the broad expression of federal non-liability. The use of "the broadest and most

---

**15.** Plaintiff also argues in passing that section 702c should not be deemed to immunize non-flood control operations of a multi-purpose facility because the immunity "would provide a disincentive to the government in maintaining a high standard of care in its non-flood control activities, resulting perhaps in a greater num-

ber of incidents like that complained of here." Plaintiff's Brief, filed Jan. 12, 1978, at 6. This argument is appropriately addressed to Congress. This court cannot base its ruling on such a consideration in the absence of direction from Congress.

emphatic language," *National Manufacturing Co. v. United States, supra* at 270, in establishing an absolute bar to federal liability serves that purpose by empowering the courts to dismiss damage actions arising from alleged negligence in the operation of flood control projects or multi-purpose projects that are designed to further a flood control purpose with a minimum of litigation expense to the United States. Federal non-liability is advanced by prompt dismissal of such damage actions. The second point to be considered is relevant only to multi-purpose projects which include a flood control purpose. All such projects since 1936 have been enacted in the context of the continuing immunity afforded by section 702c, and the court must assume that congressmen considering appropriation bills for such multi-purpose projects were cognizant of section 702c. *See Cannon v. University of Chicago*, 441 U.S. 677, 695–98, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560, 575–76 (1979). Although no determination is possible as to any particular appropriations bill, the presence of a flood control purpose and the concomitant non-liability provided in section 702c may have been crucial to the enactment of appropriations authorizing construction of a multi-purpose project. Once the United States has embarked on a multi-purpose project designed in part to provide flood control, the imposition of liability for damages from or by floods or flood waters caused by or deriving from the operation of that project will necessarily subject the United States to liability because it sought, at least in part, to control floods. Such an imposition of liability being forbidden by section 702c, this court declared in *Sanborn* that section 702c

> protects the government from liability for damage caused by floods allegedly caused by the operation of a river project which has, as one of its purposes, flood control, if the action giving rise to the damage was undertaken in furtherance of one of the purposes of the multiple purpose project.

*Sanborn v. United States, supra* at 659.

This court's reexamination of the cases and materials on which the *Sanborn* decision was based, in the light of decisions rendered since the *Sanborn* decision, and the briefing of the parties, has not revealed a basis for alteration of the reasoning expressed in *Sanborn*, particularly in view of the Tenth Circuit's decision in *Callaway v. United States, supra*, which is consistent with this court's reasoning.

There are two issues to be resolved at this point which were not raised in *Sanborn*. The first is the definition and scope of the multi-purpose project itself; in other words, does the fact that the Central Valley Project, as a whole, is a multi-purpose project devoted in part to flood control immunize the component parts or units of the Project which include certain sub-projects that are not themselves devoted to flood control in any way. The second question is whether, given the allegations in the complaint in this action, the court can determine on a motion to dismiss that the action giving rise to the damage was undertaken in furtherance of one of the purposes of the multi-purpose project.

The initial issue is directly presented herein because the complaint alleges that the damage arose from the operation of three designated parts of the Central Valley Project: Shasta Dam and Reservoir, Keswick Dam and Reservoir, and the Trinity River Diversion. The Shasta and Keswick facilities are, indisputably, multi-purpose facilities which are devoted in part to flood control. Thus, they fall directly into the reasoning set forth in *Sanborn*. The Trinity River Diversion, however, is not a flood control project, even in part. As described by the Court of Claims in *Accardi v. United States*, 599 F.2d 423 (Ct.Cl.1979) (adopting the trial judge's decision),

> The principal purpose of the Trinity River division, authorized by Congress in 1955 as an addition to an integral part of the massive Central Valley Project, and completed in or about 1964, was to increase the supply of water available for irrigation and other beneficial uses in the Central Valley of California. Although one of the purposes of the Central Valley Project as a whole has been, and is, flood

control, the Trinity River division was designed to store and provide water for use in irrigation, the generation of hydroelectric power, and the preservation and propagation of fish and wildlife. Flood control protection was not one of the stated purposes of the division, and it is not, and has not been operated as, a flood control project.

*Id.* at 424–425. The *Accardi* decision was rendered in the context of a Fifth Amendment taking claim, and the immunity of section 702c was therefore irrelevant to the issues before the court. In fact, that section was not even mentioned in the *Accardi* decision. *Accardi* correctly states that flood control is not one of the express purposes for which Congress appropriated the funds for the construction of the Trinity River Diversion. *See* Act of Aug. 12, 1955, ch. 872, §§ 1, 2, 69 Stat. 719.

The question, then, is whether plaintiff may sue the United States for damages caused by floods or flood waters deriving from the operation of the Trinity River Diversion. As the United States notes, *Accardi* found that

the conservation and control of water contemplated (and accomplished) by construction of the Trinity River division necessarily resulted in an incidental flood control benefit on the Trinity River downstream of the division.

*Id.* at 426. That finding is not significant to the instant action, however, for two reasons. First, plaintiff's land is not a part of the Trinity River watershed to which this incidental flood control benefit was conferred but is located on the Sacramento River to which water was or may have been diverted. Second, and more important, the existence of an incidental flood control benefit not contemplated in the appropriation is irrelevant. In *Peterson v. United States, supra,* the action by military engineers dynamiting the ice jam on the Chena River was taken specifically to alleviate flooding on the Ladd Air Force Base, yet the Ninth Circuit held that section 702c provided no immunity from damage actions arising from injuries suffered by persons downstream. The flood control purpose and effect of the decision to dynamite the ice jam was insufficient to invoke the immunity of section 702c because the decision was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization." *Id.* at 275. If the purposeful efforts to control and alleviate flooding at Ladd Air Force Base do not bring section 702c into play, then the incidental flood control benefits of the Trinity River Diversion, standing alone, cannot do so. For these reasons, this court rejects the United States' suggestion that section 702c applies to the Trinity River Diversion by reason of the *Accardi* court's finding that the facility conferred incidental flood control benefits in the Trinity watershed.

The precedent set in *Peterson* is not, however, directly applicable to the Trinity River Diversion. Unlike *Peterson,* wherein the flood damage "was *wholly unrelated* to any Act of Congress authorizing expenditures of federal funds for flood control," *id.,* the flood damages herein arise from the operation of the Central Valley Project and, in particular, from one portion of that Project which is unrelated to flood control but is interrelated with the remaining facilities of the Central Valley Project on the Sacramento River which do have flood control as one of their purposes. The Central Valley Project is operated as an integrated whole, rather than as a number of separate, isolated parts, because water releases at any one facility must be coordinated with releases at other facilities in that river basin. This interrelation is reflected in the Act of Aug. 12, 1955, ch. 872, 69 Stat. 719, which authorized the construction of the Trinity River Diversion. Section 1 of that Act provides that, "for the principal purpose of increasing the supply of water available for irrigation and other beneficial uses in the Central Valley of California," the Secretary of the Interior is authorized "to construct, operate, and maintain" the Trinity River Diversion "as an addition to and an integral part of the Central Valley project," *Id.* In section 2, the Act declares in part:

the operation of the Trinity River division shall be integrated and coordinated, from

both a financial and an operational standpoint, with the operation of other features of the Central Valley project, as presently authorized and as may in the future be authorized by Act of Congress, in such manner as will effectuate the fullest, most beneficial, and most economic utilization of the water resources hereby made available . . . .

*Id.* The 1955 Act was adopted in the context of such earlier legislation as the Act of Sept. 26, 1950, ch. 1047, 64 Stat. 1036, wherein Congress declared:

the entire Central Valley project heretofore authorized under the Act of October 26, 1937 (50 Stat. 844, 850), and the Act of October 17, 1940 (54 Stat. 1198, 1199), is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for construction under the provisions of the Federal reclamation laws of such distribution systems as the Secretary of the Interior deems necessary in connection with lands for which said waters are to be delivered, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings, and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes.

*Id.* § 1.

█ In view of the essential coordination and integration of the Trinity River Diversion into the Central Valley Project as a whole, and the authorization of the entire Central Valley Project for flood control purposes, the court cannot find that the Trinity River Diversion is excepted from the umbrella of immunity accorded by section 702c. The rationale adopted in *Peterson* for the inapplicability of section 702c to the dynamiting of the Chena River ice jam cannot be carried over to circumstances such as these in which the facility is a part of a major multi-purpose project devoted in significant part to flood control.

The Ninth Circuit's decision in *McClaskey v. United States, supra,* discussed in note 4 above, is better precedent for the instant action than *Peterson.* In *McClaskey,* the injury was allegedly caused by a temporarily relocated railroad crossing spanning a creek channel. The railroad crossing itself had no flood control purpose whatsoever, but its relocation was necessary to the completion of the multi-purpose project. Although the Trinity River Diversion is not temporary, it is analogous to the *McClaskey* railroad crossing in that it is an integral and necessary part of the multi-purpose project.

In light of the legislative mandate that the Trinity River Diversion must be integrated and coordinated from an operational standpoint with the other facilities of the Central Valley Project, the court concludes that the fact that plaintiff's injury may have been caused in whole or in part by the operation of the Trinity River Diversion is not a basis for avoidance of the immunity of section 702c.

Having resolved the initial question concerning the application of section 702c to the Trinity River Diversion, the remaining point to be discussed is whether, given the allegations in the complaint, the court can determine whether the action giving rise to the damage of which plaintiff complains was taken in furtherance of one of the purposes of the multi-purpose Central Valley Project. If so, then dismissal of the complaint is compelled under the reasoning set out in *Sanborn v. United States, supra.*

As discussed in the opening portion of this Opinion, the complaint's operative allegations concern the "Project Works," by which plaintiff refers to the Shasta and Keswick Dams and Reservoirs and to the Trinity River Diversion. The complaint declares that these Project Works

are capable of regulating the level of water in the Sacramento River below the works so as to greatly diminish or augment the natural flow of said River, at the direction of the operator.

The United States, through its agents and employees, is the operator of the Project

Works. The charging allegations of the complaint are as follows:

> Beginning on or about December 1, 1973, and continuing through April, 1974, defendant, its agents and employees operated the Project Works negligently, without due or reasonable care, so as to establish and maintain the flow in the Sacramento River above and adjacent to Princeton Ranch at such high elevations as to cause water in large amounts to seep from the Sacramento River into Princeton Ranch. The seepage was the natural and predictable result of the high elevations.

The complaint does not allege explicitly that the operation of the Project Works at issue was in furtherance of the purposes of the Central Valley Project. Plaintiff argues that the motion to dismiss must be denied because, at the pleading stage, it cannot be determined whether the action giving rise to the damage was undertaken in furtherance of one of the intended purposes of the Project. The United States responds that the allegations in the complaint are sufficient for dismissal and that, if plaintiff seeks to rely on a claim that the Project was not operated for one of its intended purposes, then plaintiff should be required to allege *ultra vires* operation specifically.

As this court reads the complaint, it does appear to allege, at least by implication, that the operation of the Central Valley Project which caused plaintiff's injury was within the scope of authority granted by Congress. If the particular operation of the Project at issue were not in furtherance of one of the intended purposes of the multi-purpose project, then the existence of United States' liability under the Federal Tort Claims Act is drawn into question. That Act permits suits for damages for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." The court has not found guidance for a determination whether an employee of the United States may be "acting within the scope of his office or employment" when he undertakes to operate a government facility in a manner that is not in furtherance of one of the intended and authorized purposes of the facility. Any attempt to resolve this question, however, would amount to an advisory opinion on the present state of the pleadings. The issue should be reached, if at all, based on amended pleadings that frame the question for decision.

## V. *Conclusion*

In accordance with the foregoing discussion, this court finds that the United States' motion to dismiss is well taken. First, the immunity provided in section 702c applies to seepage waters that percolate through the ground as well as to flooding waters flowing on the surface of the ground. Second, the Central Valley Project is clothed with immunity notwithstanding its multiple purposes. The court declines to accept plaintiff's characterization of the Project as having only a minor flood control purpose, and section 702c is not inapplicable because the Bureau of Reclamation, rather than the Army Corps of Engineers, is primarily responsible for the management of the multi-purpose dams and reservoirs of the Project. Plaintiff's arguments concerning the necessity for an incentive to operate the Project's facilities with care and the inequities that result from the application of the immunity in the context of a multi-purpose project with partially reimbursable costs are properly directed to Congress but cannot form the basis for this court's decision. Finally, this court adheres to its prior decision in *Sanborn v. United States, supra,* in holding that section 702c immunizes the United States from liability for damages caused by floods deriving from the operation of a multi-purpose river project which has, as one of its purposes, flood control, when the actions giving rise to the damage were undertaken in furtherance of any one of the authorized purposes of the project. This immunity clothes not only the facilities of the multi-purpose Central Valley Project which were specifically authorized and designed in part for flood control but also those other facilities, such as the Trinity River Diversion, which are an integral and essential part of the Project even though not specifically intended to further a flood control purpose,

because the Central Valley Project is operated as an integrated whole in furtherance of its many authorized purposes.

Pursuant to the foregoing conclusions, this court hereby grants the United States' motion to dismiss. The dismissal is without prejudice to the filing of an amended complaint within 30 days from the date of this decision. Leave to amend is granted because, although the allegations in the complaint strongly imply that the operation of the Central Valley Project giving rise to plaintiff's injury was in accordance with congressional authorization, it may be that plaintiff intended to proceed in part on a theory of *ultra vires* operation. If so, it is appropriate that plaintiff specifically so plead.

IT IS SO ORDERED.